8 INTEL CORP v. NEGOTIATED DATA NEGOTIATED DARE This appeal presents the interpretation of an old cross-licensing agreement between Intel and National Semiconductor, began in 1976, ended in 2003. It contained two clear capture provisions. Before you get into the merits of the argument, what is the basis for jurisdiction in this case? Where is there a case of controversy? The case of controversy is over... This is an issue that we have to satisfy ourselves as MET, and I just want to make sure that we're not overlooking this. Well, NData has asserted infringement of these claims against Intel and some of its customers below, and the case arose when Intel brought a declaratory judgment action against NData. For non-infringement and license. NData has asserted infringement charges against Intel directly? That's right. The district court's order was an order for summary judgment of license and non-infringement. The complaint, the appendix, page 316, talks about an actual controversy has arisen. It says, absent a declaration, NData will continue to wrongfully assert the patents in suit against Dell and threaten Intel and its customers. So it sounds like that's, you know, there's a case of controversy because there will be a case of controversy. So what I'm getting at is, is this not simply a question of future activity? There was and is a current threat of infringement? Yes, Your Honor. Can I ask you another house... Real housekeeping, which is that there's certain documents that are marked confidential, as I recall, in the appendix. There were. And that includes some of the key license agreements that are at issue here. Portions of those agreements are cited in the briefs and not marked confidential. So what is it? Your Honor, NData's position is that the national license is not confidential. We negotiated with the other, with Intel, and their position was that it was confidential. So we wanted to, rather than burdening the court with motion practice, just excerpt out the points that were most confidential, you know, the price. Okay. So part of it is and part of it isn't. Presumably the stuff that's cited in the briefs that are not designated confidential. That's right. And everybody agrees they're not. That's right, Your Honor. And much of the language in the briefs was actually cited, is in the Federal Register in the Intergraph case. So I think out of an abundance of caution, we took out, you know, particular numbers, particular, yeah, the prices of the agreements. But the provisions themselves, particularly with the national license, are not confidential. So, but these, the two clear capture provisions are first that the patent, that the patents are A, owned and controlled, owned or controlled by national, and B, issued as of the agreement's expiration date. And NData's three reissue patents are not captured by those clear provisions. Mr. Tholender, NData cites the two cases that's in its blue brief. There's in the page numbers that you cite so many times, Alt Bader v. Freeman, which is the Supreme Court case, and Intergraph Corp., which is Fed Circuit in 2001. In Intergraph at 1356, in that opinion, we focused on the intent of the parties. And based on broad, unqualified language used in the purchasing agreement in that case, held that it would be a strained interpretation of the licensing agreement to find that national had rights to patent applications that it momentarily possessed, whether it was seconds or hours. The focus in Intergraph was the party's intent based on the language used in the agreements. Also in Alt Bader, at 364, the Supreme Court specifically points to the rule of estoppel, maybe it's sort of indicative, but it's in there, as a potential analytical tool. It seems to me that Alt Bader and Intergraph, taken together, support Intel's position, and yet you cite them all the way through. I want you to explain to me why I'm misreading. Yes, Your Honor. In terms of the intent, I think this Court in Intergraph did look at the intent. But in the end, the question was whether or not the parties intended that a patent that was only fleetingly owned or controlled could, in fact, be a national patent in that situation. And to answer that question about whether that was the intent, it looked to the capture provision and said, actually, what this provision says, and the Court was looking first at the – those were applications. Weren't they looking at the intent of the parties as opposed to whether it could be? They were looking at the intent of the parties, absolutely, Your Honor, but that intent was controlled by the provisions, and in particular, the capture provision that said that only those patents issued, sorry, owned or controlled by NDATA during the term of the agreement would be national patents. But here, the agreement, the national license, was a pretty clearly – pretty clearly set forth the position of the parties as basically saying, you know, you can use anything covered by our patents, and we can use anything covered by your patents. It was sort of peace forever under those patents. That evinces a broad intent, does it not? It does, and it – Why wouldn't that include the reissues of the patents that are clearly covered by the license? Your Honor, the clear intent of the parties in that patent was indeed to create a concise, broad patent that covered – that, in fact, covered reissues without question. It did cover reissues so long as they met the two clear capture provisions, which were they were owned or controlled by national, or they were issued prior to the expiration date. And keep in mind, this license lasted almost 30 years. So I think when the parties wrote this agreement, clearly their intent was not on treating particular patents, particular types or classes of patents differently based on the varying characteristics. But the argument I think you're – the position that I think you're taking would result in, in effect, Intel being – having lost the rights under the original patents because the reissues replaced those original patents. And therefore, whatever right they had is gone, even though a lot of the claims are the same. Your Honor, I think the rights – the rights in the patent are determined by the license agreement and the statute. And the statute says that on reissue, any rights in an original are extinguished. And so that necessarily means that any rights – if the patentee's rights are extinguished, any rights from the licensee flowing through the patentee is extinguished as well. That is a statutory – Well, you argue – I think I couldn't – I wasn't quite clear what your position was. I thought in one place you mentioned that, well, it's only the new claims, the reissued claims, so that the claims were originally the patents, they still live. And then I think you took it back in gray or something. What's your position on that? Is it – is your argument covering everything or just the new claims, if any, in the reissue? Your Honor, the – NDATA's position has been consistent, although there was some confusion about it below. But NDATA's position has been consistent that the national license covers patents in a whole or not at all. And that's Intel's position as well. Okay. The problem I'm having with your argument in this case is it seems to me that Intel's license is a right to use the patented invention free of suit. That's what a license is. And isn't the same invention embodied in the reissue patent as in the original patent by law under the reissue statute? Are you referring to Section 252? Yes. Section 252 – Well, am I wrong about anything I said? I mean, you have a right to license to use free of suit under the license, the patented invention, right? Well, no, the provision talks about national patents are those patents that are issued before the expiration and to NDATA's ownership and control. And in Intergraph, the court addressed continuation patents. There's no indication that a treatment is different based upon whether it's subject to an earlier filing date or not. The question – I guess the question you're asking, I mean, or one way to see it is whether or not the parties could have decided to exclude reissue patents. And I think the plain language excludes these patents. So the question I'm asking goes to the fact that under the licenses, I read it and I think every fair-minded person would read it. Intel got the right to practice the patented invention of the patents that were listed. Because you go for a reissue on a particular patent and you get a new number and a new piece of paper, is it really – does Intel lose all of the rights that had to practice the patented invention? Are you really patenting a completely different new invention when you go for a reissue? You can get your new number? Well, the – That's my question. I think for purposes of this license, yes, it is a new patent. It is a new invention. The reissue statute provides that in order to be eligible for reissue, a patent has to be partly inoperative or invalid. So I do think it's not fair to say that this is exactly the same invention, exactly the same patent as it was before. The old one was partly invalid. Let me follow up with Judge Prost's question and ask you this hypothetical. Let's suppose I have a patent on a Blockbuster piece of technology. You want to open a business to exploit that technology. So we enter into a license agreement, and I grant you an irrevocable, fully paid-up license under my patent for $10 million. You pay me the $10 million, you start your business. Two weeks later, I file for a reissue application to correct for some disclosure inaccuracies. I don't change a word in any claim, and the patent office issues a reissue patent to me. Are you out of luck? Can I sue you now? Because you paid me the $10 million, that's fine, but you don't have a license anymore because that original patent was surrendered. Under the law, I think that is the result. And by the way, following on Judge Lin's hypothetical, you've set up an assembly line and put another $10 million into manufacturing the product. So you're just stuck. There's no estoppel. There's no nothing. That's an excellent point, and I think maybe that will resolve some of these concerns, is that Intel expressly reserves any question of equitable theories of relief. And so there are no theories of implied license or estoppel or waiver or anything like that. So I think the law may have ways to address seeming inequities, but I think the law is clear that when the patent reissues, the original is extinguished. And in the words of the Supreme Court, no rights, such as grow out of the reissued patent, remain. There are none under the original. That's the Supreme Court. You're well into your rebuttal, but we'll restore your rebuttal time if you'd like to reserve some. Thank you. Thank you, Your Honor. All right. Let's add. Good morning, Your Honor. May it please the Court? Good morning, Mr. Stevens. Let's give you an extra two minutes. So we'll start with 17. OK. Thank you, Your Honor. I think Judge Wallach and you, Judge Lynn, hit the nail on the head when you said that Intergraph focused on the intent of the parties. I think what was happening in that case was Intel was arguing a very detailed interpretation, and this court found that, no, if you look at the mutual intent of the parties, what Intel is arguing in that case is not consistent with what that mutual intent suggests should happen. And the same is true here. As you observed, Judge Lynn, this is clearly a license that established peace forever between these parties. It was a 10-page license executed in 1976. That's very early in the semiconductor industry. National semiconductor, the other party to the agreement who's not here today. And Intel were the two parties to that agreement. They're pioneers in that field. I would submit that the district court correctly found, as I think Your Honors are observing, the agreement uses concise language to grant broad rights to all patents owned or controlled by the other party. But if we view the license agreement as having some fairly straightforward technical terms as to what's covered and what's not covered, pardon me, and reach the conclusion that the reissue patents don't technically fall under the license agreement, what's your position with respect to this equitable notion of being evicted that was teased out by my hypothetical? Well, I think, Your Honor. Have you preserved that issue? Have you reserved it for another occasion? Where do you stand on that? Well, Your Honor, I think that that equitable issue goes directly to how you give effect to the intent of the parties, right? Because what NDATA is arguing, which effectively they concede is an inequitable result in footnote two in their reply brief, it's not reasonable to assume that the parties would have manifest an intent to agree to an inequitable result. Yeah, but sometimes people mess up. I mean, the difficulty I'm having is that, and we know there are other agreements out there, and presumably if you have to negotiate one tomorrow, or I did, I'd put patents and reissue patents in the license agreement, right? And that's probably at least today, in modern times, the more common practice. So you're right, even if the results are inequitable and they're horrible, if the language of the license is clear and patent means patent, reissue statute talks about the original patent being surrendered, why don't you have to live with that irrespective? I mean, people mess up sometimes and they have to live with the consequences of that. Why couldn't something that easily could have been covered by just adding the word reissue be something we should cover up now? Two reasons, Your Honor. First of all, under California law, the court is required to give effect to the mutual intent of the parties. Even if there's no ambiguity? Well, I would submit, Your Honor, that at best, and Data could argue, even under the scenario where you conclude that there's some technical reading by which reissues might fall outside the agreement, and I don't concede that, by the way. But even if that were the case, I think at most you get to a latent ambiguity, that it's not clear. In other words, the agreement never talks about reissue patents at all. It simply talks about all classes of patents. So the most you can argue, I think, is that realistically, there's two reasonable interpretations here. And at that point, you do have to look to the mutual intent of the parties. And that clearly requires the result that Intel suggests. And that evidence is because of the declarations, whatever the statements of the parties that negotiated it? Well, there's two ways you get there, Your Honor. First of all, and this is the way the district court looked at it, you look at the agreement as a whole. You don't have to look at extrinsic evidence at all to conclude that the mutual intent of the parties on the face of the agreement itself is to grant these broad rights, and as the court put it, to avoid future infringement suits. And I think it's clear enough if you consider what the situation the parties were in. In other words, they were granting each other broad patent rights to entire portfolios so that they could invest heavily, and they have invested heavily, in the particular kinds of technologies that each party was engaged in developing. The particular technology at issue here, for example, is USB, which exists in every computer essentially today. And National and Intel both spent lots and lots of money developing that technology. They both have extensive portfolios that cover that technology. It's just not reasonable to conclude that the parties intended that 10 years later, one of the parties or one of their affidavits would just opt out of the agreement by looking through their portfolio, finding some patents that would cover USB technology, and reissuing them. That's an inequitable result, and it can't be what the parties intended. Just the face of the agreement alone is enough that the court can conclude that. I didn't get a chance to ask Mr. Tholender, although it's more properly his question, but I'm going to ask you to take it up. And that is, something disturbed me about the assignment to vertical networks and their ensuing actions and then having it transferred again. What's your position on that? Well, certainly, Your Honor, I think National had the right to make the assignment. Yeah. But those assignments were... But they were former employees. Well, I guess I'm not so familiar with the facts of the individual employees involved, but I believe you're right. I believe that there were former employees that left National to form Vertical. Right. And then the principles of INDATA, I believe, are the patent lawyers for Vertical. And it's meant to me that what was going on when I read the record was, here's for... I mean, it could look like, and that's why I wanted to raise it to Mr. Tholender, it could look like you say to yourself, gee, we can't do this, take it in and do a reissuance because of the language that's pretty clear in our contract. But if we transfer it to someone... That's a critical point, Your Honor. It's interesting here that there's no disagreement between National and Intel about the effect of this agreement. It's a very unusual contract in that case. The parties to the contract agree. What you have here is a stranger to the contract, INDATA, urging a result that benefits them, but does not benefit either of the contracting parties. And I agree with Your Honor, Judge Wallach, that it's very, very unlikely that either of the two parties to this agreement would ever take that approach. It's only when these patents end up in the hands of a third party that you'd find somebody who would be prepared to make that argument. From my view, that third party is a beneficiary of a second party who was in fact the first party. And you mean National? Yeah. I don't fully understand the precise relationship between National and INDATA, to be honest. I don't think the record actually reflects that. All I saw was former employees and then they went bankrupt. Certainly. I'd like to address what Your Honor, Judge Prost, mentioned. You asked if a reissued patent is directed to a new invention. And Mr. Thollender said, yes, it is. In fact, that is directly contradicted by the reissued statutes themselves. Section 251, which authorizes parties to apply for reissue of a patent, says specifically that it has to be for the same invention as the original patent. You're talking about the reissued patent for the invention disclosed in the original patent? Yes. It authorizes the director to reissue the patent, not some other patent, and it's to reissue the original patent for the invention disclosed in the original patent. And that reissue is for the unexpired term of the original patent. And the license here is quite clear that National gave up its right to exclude Intel from practicing the patent for the entire life of that patent. You can't just take away the unexpired portion of the term by correcting a defect through reissue. And Section 252 is the portion of the reissue law that gives effect to reissue patents. In other words, Mr. Tholender and NDATA are entirely dependent on Section 252 to assert these reissue patents in the first place. Without Section 252, these patents have no force and effect. And Section 252 contains the same language that you see in the statutes that authorize certificates of correction. And that language, which says every reissued patent shall have the same effect in operation in law on the trial of actions for causes thereafter arising, as if the same had been originally granted in such amended form, establishes a nunk-pro-tunk substitution of the reissued patent for the original. The Patent Office interprets it that way. There's a portion of the MPEP, Section 205.05 that says that a reissue application is an application for a patent to take the place of an unexpired patent that's defective. In this court, the PTO argued in Cooper v. Dudas that reissues are deemed by operation of law to replace the surrendered originals and thus are entitled to treatment as original patents. So why would one ever put in language in a license agreement that says patents and reissues? Right. For the same reason that parties put in redundant language in lots of agreements, Your Honor. I guess belted suspenders. I don't think it's necessary. I don't think it was necessary here, and I don't think it's necessary ever. So you would argue, I take it then, that there should be a presumption that reissues are included whenever a patent is licensed unless the patentee decides to expressly state otherwise in the license. That's correct, Your Honor. I think Section 252 requires that result. And the laws that are embodied in Section 251 and Section 252 have been around a long time. They were on the books close to 100 years at the time this agreement was executed in 1976. So the parties were entitled to rely on that. In fact, under California law, parties are presumed to know the law. So Intel and National, sophisticated contracting parties, were entitled to rely on this nunk-pro-tunk substitution that is afforded reissues under Section 252. And it would be inappropriate to require, as Mr. Thollender suggests, that if they don't mention reissues, that they're somehow able to just retract the license that National had granted Intel from the beginning. It leads to observed results. As the panel has observed, if you have this argument, it would apply potentially to any license. A license to patentee on day one, is reissued on day two. According to Mr. Thollender and Indata, that's a new patent, not subject to the original license. That makes no sense. And then I get to sue my former licensees. Absolutely. As soon as the reissue has effect, then you can sue your former licensee. That can't be the intent of any party entering into a license. And it can't be the effect of the statutes. Now, Mr. Thollender has never given a reasonable explanation of the pro-tunk language that we point to in Section 252, which as I mentioned, also appears in Certificate of Correction statutes. Like I said, Intel is entitled to rely on that. The parties no doubt did rely on that, in not listing the possible effects of every different kind of patent office procedure that might have happened after the license was signed. With that, if you have no more questions, I'll sit down. Thank you very much. All right. Mr. Thollender, you've got five minutes if you need it. Thank you, Your Honor. Mr. Thollender, would you hit that area that I didn't get a chance to ask you about? Yes. The vertical, the only evidence in the record, and I apologize, this isn't in the Joint Appendix, but it is at Docket 7, Page 7, in Exhibit K. And the only relevant evidence on this point shows that vertical did not have access to the agreement and was not aware of its capture provisions until after the reissue applications were filed. So there can be no question of any kind of manipulation here. Oh, I mean, they were employees of National, yes? That's right. But the Intel-National agreement was generally considered confidential, and I don't think it was... So when you say there's no question, there can be questions, for example, of agency and that sort of thing and imputed knowledge. So if the point is you're worried that National engaged in some bad behavior, I would point to the fact that National, although inadmissible and irrelevant, filed RFAs that tend to support Intel here. So I don't think there's really a story that shows that there was some kind of manipulative intent. What about the 252 language that your friend referred to? Yes, and I'm sorry I didn't get to it in the opening. The 252 does not say anything about substitutions or non-protonque. It says that... We're talking about 251, I think. Oh, 251? No, actually, I meant 252. Oh, right. 252 is basically the argument that the law... Well, it says every reissued patent shall have the same effect and operation in law. The law, as if it's same had been originally granted. On the trial of actions. I think that's the language that he referred to. Absolutely. So why does it not mean what he says it means? Frankly, it is a forward-looking provision about the treatment of patents at trial. There is no reason to think that it changes, that it looks backward to change license agreements, to rewrite license agreements. Well, I mean, I can't be certain, but it certainly has language, look-back language, as if the same had been originally. I mean, that's all look-back language, is it not? That's true, but it's framed by this on the trial of causes fraction thereafter arising. So in other words, it's only when the operative facts are going forward. And the second part of that sentence talks about when operative facts are, when backward-looking operative facts are. Now 251, which is that, I mean, it goes to the question I asked you earlier about your licensing the invention that's patented. And the language says, reissue the patent for the invention disclosed in the original patent. That's a reissue. So it's the same invention, right in the original and in the reissue? The, 251 uses that term. The inventions here, I don't, well, A, the patent, the license talks about patents and not inventions. I think that is important. But the claims here, and this, the record isn't developed on this point, but there's almost 300 new claims came out of this reissue process. So the reissue is a different invention than the one that was originally patented? Well, it was a fully operative invalid. Invention, whereas the original one was partly inoperative or invalid. That's what I would say. But it's the same invention? Okay, yes, Your Honor. On that point, I'll stand with that, the patent licenses, patents. On the last point about the ambiguity, the court asked about that. And I just think that the district court didn't find any ambiguity here. And that the other evidence of intent can't trump the plain meaning of this agreement. Would you just clarify one thing? You said on that point, I'll stand with that, the patent, and then I think you said licenses, licenses? The license refers to patents. Okay. Yeah, I think that the plain language, I apologize for the confusion. The plain language covers all classes or types of patents. So really the question is, is a re-issue a class or type of patent? And if it is, then under the plain language of this agreement, it's subject to those recapture provisions. Thank you. All right. Thank both counsel. The case is submitted. That concludes our argument this morning. All rise. The Honorable Court is adjourned. Committee is adjourned.